2004 OK 30

STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Catheryn HUMMEL, Respondent.

No. SCBD 4736.

Supreme Court of Oklahoma.

April 20, 2004.

## OPINION

**WATT, Chief Justice:**

¶ 1 The Complainant, Oklahoma Bar Association (the Bar), filed a complaint against Respondent, Catheryn Hummel, a licensed attorney in Oklahoma, pursuant to Rule 6, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.2001, Ch. 1, App. 1–A., for violations of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S.2001, Ch.1, App. 3–A. Counts I through V represent grievances filed by five of Respondent's former clients. Count VI is based on allegations raised by the Bar for her failure to respond to the grievance in Count V.

¶ 2 Respondent and the Bar stipulated as to the facts, the rules she violated in each count, and the conclusions of law. They also stipulated that her misconduct constituted grounds for professional discipline and recommended a one-year suspension of Respondent's license and costs of the proceeding. They stipulated that she committed multiple violations of Rule 1.1,[1] Rule 1.3,[2] Rule 1.4,[3]

---

1. **Rule 1.1. Competence.** A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

2. **Rule 1.3. Diligence.** A lawyer shall act with reasonable diligence and promptness in representing a client.

3. **Rule 1.4. Communication.** (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Rule 3.2,[4] and one violation each of Rules 1.2(a)[5] and 1.15(b),[6] ORPC, and two violations of Rule 5.2,[7] RGDP.

¶3 Respondent was diagnosed with clinical depression. She is currently undergoing counseling and is taking medication for the condition. She testified she knows the depression contributed to her ability to represent her clients, although she did not offer it as an excuse for her behavior. She testified she began winding down her practice in September, 2001, and has not practiced since Spring, 2002.

¶4 In its Trial Panel Report, the Trial Panel of the Professional Responsibility Tribunal (the PRT) accepted the parties' Stipulations as to the Findings of Fact, Conclusions of Law and the recommendation for discipline, except for the correction of restitution in Count V, incorrectly noted as Count IV, from $3,000.00 to $1,500.00. In reaching its recommendation of a one-year suspension, the PRT considered the mitigating factors of her depression condition, her treatment of that condition and her professed intention of making restitution. Also considered, however, were Respondent's two previous private reprimands from the Professional Responsibility Commission (PRC)[8] and her current suspension for failure to complete Continuing Legal Education (CLE) requirements and the failure to pay her annual Bar dues.

## COUNT I

¶5 Jennifer Jones hired Respondent to file and complete a motion to modify custody. Respondent filed the motion and represented Jones through some pre-trial proceedings. Respondent agreed to prepare a proposed settlement offer based on a psychologist's report required by the court, a proposed agreed order and a proposed Joint Custody Plan to opposing counsel. The proposed plan was rejected, as was the settlement. However, Respondent failed to communicate with Jones. When she finally communicated by letter, she told Jones the pretrial and trial dates had not been set because Jones had failed to answer the interrogatories filed almost a year earlier by Jones' former husband. However, Jones testified she had completed them and faxed them to Respondent's office shortly after receiving them. Jones also stated she tried to get in touch with Respondent from October, 2001 to March, 2002, but that Respondent never returned her phone calls. Because she was never able to get a trial date set, Jones fired Respondent and hired another attorney. Respondent's actions in Count I constitute violations of Rules 1.1, 1.3, 1.4, and 3.2, ORPC.

4. **Rule 3.2. Expediting Litigation.** A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

5. **Rule 1.2. Scope of Representation.**
   (a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

6. **Rule 1.15(b). Safekeeping Property.**
   (b). Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

7. **Rule 5.2. Investigations.** [T]he failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further· time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

8. The PRT found Respondent received a private reprimand in 1990 from the Professional Responsibility Commission (PRC) for the failure to respond within 20 days to two letters from the Bar asking for a response to an informal grievance. The Bar subpoenaed Respondent and took her deposition. She also received a private reprimand from the PRC in a different matter involving neglect and unprofessional conduct. She failed to respond to a motion for summary judgment, resulting in a decision against her client. The PRC also found Respondent used loud and profane language in an argument with her client.

## COUNT II

¶ 6 Respondent was hired by George Allen in 1995 and 1996 to complete an appeal from a criminal conviction. She timely filed the appeal which was denied. In September, 1998, Allen requested Respondent to send his file to his sister so that he could begin pursuing a writ of habeas corpus. She failed to send the file. Beginning in March, 1999, Allen asked Respondent numerous times to forward his files, but she failed to respond.

¶ 7 Allen filed a grievance with the Bar which requested Respondent on November 5, 1999, to return the file in two weeks, which she failed to do. On December 15, 1999, Allen advanced Respondent $50.00 for the costs of mailing his file, with her agreement to return the excess money. As of June 8, 2000, Allen had not received his file, and the Bar asked Respondent again to communicate with Allen. However, she failed to respond, and the matter was opened for formal investigation on August 15, 2000. On November 11, 2000, she responded, stating she had to search for many of the files in storage, but would ship the files with an inventory to Allen. The Bar received a proof of mailing which it forwarded to Allen on November 30, 2000. However, he indicated on December 8, 2000, that the file he received was incomplete and that he had not received his refund. The total cost to send the file was $6.60, and the refund to Allen remains outstanding. Respondent's actions constitute violations of Rules 1.1, 1.3, 1.4 and 1.15(b), ORPC, and Rule 5.2, RGDP.

## COUNT III

¶ 8 In October, 1999, Respondent was hired by Angela Gatz to file a motion to modify visitation with her minor son. Respondent filed the motion in November, 1999. Gatz's former husband responded and thereafter filed a motion to modify visitation, a motion for judgment for medical expense arrearage and a motion to modify child support.

¶ 9 The pre-trial conference was held a few months later. Respondent failed to appear, although Gatz was present, and Respondent's office was called. An assistant from her office appeared but was unable to conduct the pre-trial conference. Another pre-trial conference was held six months later. Four days before the next scheduled status conference was to be held, with the trial date already set, Respondent cancelled her appointment with Gatz. Respondent appeared at the trial on February 21, 2001, but Gatz was not present. The trial court entered an order, restricting Gatz's visitation with her son, increasing her monthly child support obligation and ordering her to be responsible for her son's medical bills. Additionally, the order indicated Respondent withdrew Gatz's Motion for Enforcement of Visitation Rights.

¶ 10 Gatz did not give Respondent authority to make the agreements she made on her behalf at the trial, although Gatz's former husband alleged that Respondent advised the court she was authorized to enter into a settlement of this matter.[9] She failed to advise Gatz of the trial and the orders. When Gatz's son mentioned the terms of the new visitation order, Gatz called Respondent to ask about it. When Gatz finally reached Respondent after many unsuccessful attempts, Respondent denied that an order had been entered or that the trial had been held. She referred to it as a "pre-trial conference" rather than a trial, although Gatz indicated they discussed changes in her responsibility for paying child support, medical bills and insurance costs. Respondent failed to advise Gatz that a motion for attorney fees had been filed against her, and further failed to respond to it on Gatz's behalf. A judgment was entered against her therefor in the amount of $3,323.75. Gatz terminated Respondent and hired new counsel who moved to vacate the judgment. The court denied the motion, Gatz paid the judgment, and a Release and Satisfaction of Judgment was filed. Respondent's actions constitute violations of Rules 1.1, 1.2(a), 1.3, 1.4 and 3.2, ORPC.

¶ 11 In addition, the evidence supports a finding that Respondent misrepresented the facts to Gatz in violation of Rule 8.4(c), ORPC, although not charged in the complaint. "[A] stipulation by parties that a particular ethical violation occurred does not limit this Court's analysis to those ethical

---

9. This allegation was made in his Motion to Settle Journal Entry.

standards recognized or cited by the parties." *State ex rel. Oklahoma Bar Association v. Bolusky,* 2001 OK 26, 23 P.3d 268, n. 2 (citations omitted). The fact that the Bar did not specifically charge a violation of this rule is of no consequence. *State ex rel. Oklahoma Bar Association v. Bedford,* 1997 OK 83, 956 P.2d 148. If the Bar pleads sufficient facts to put the attorney on notice of the violations charged against him and allows him an opportunity to respond, this is sufficient. *Id.,* citing *State ex rel. Oklahoma Bar Association v. Johnston,* 1993 OK 91, 863 P.2d 1136. Respondent told Gatz that a trial had not been held. As a result of the trial, however, judgments were entered by the court modifying visitation with her son and granting her husband's motion for attorney fees. Rule 8.4 provides:

### RULE 8.4 MISCONDUCT

It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or *misrepresentation;* . . . . [Emphasis added.]

¶ 12 Only when Gatz' son told her that her visitation had been changed did she become aware that some judicial action had been taken against her. Even when Gatz confronted Respondent to inquire, she was told something which was not true, i.e., that there had been only a pretrial conference. Additionally, she led the court to believe she was authorized to make agreements on Gatz' behalf at the trial which ultimately led to a visitation order which was less favorable to her than the one in existence.

### COUNT IV[10]

¶ 13 Connie Wells hired Respondent to represent her in divorce proceedings which were filed by Wells' husband. The Stipulations indicate Respondent had agreed to accept service for Wells. Respondent failed to answer the divorce petition after it was filed, and more than six months later, Wells filed a grievance with the Bar. It was opened for

formal investigation on March 11, 2002. Almost three months later, Respondent filed an application in the district court to file an answer and counterclaim out of time on Wells' behalf, claiming that "Plaintiff has never formally served Defendant with said Petition for Divorce." The court granted the motion, granting an extension of 15 days until June 25, 2002. After the order was filed, Wells tried unsuccessfully to reach Respondent by telephone and in person at her office. Wells hired new counsel and requested her file from Respondent by certified mail, but she did not respond. A second certified letter was sent by Wells to Respondent on the day before the trial court's deadline for filing the answer and counterclaim, but she still failed to respond. Wells' new counsel filed an answer and counterclaim on the date they were due, June 25, 2002. Respondent never filed an answer to the divorce petition and never completed discovery. Respondent's actions constitute violations of Rules 1.1, 1.3, 1.4 and 3.2, ORPC.

### COUNT V

¶ 14 Cheri Brooks, now Thomas, hired Respondent to file a contempt citation against her former husband for child support arrearage. Respondent prosecuted the contempt citation and successfully obtained $7,676.28 of unpaid child support for Thomas. She then asked Respondent to complete the adoption of Thomas's child on behalf of her new husband. It was agreed that part of the funds received from the contempt proceeding would be used to pay Respondent's fee for the adoption. She deposited the check into her trust account, retained $3,000.00 and wrote a check on her trust account for the remainder to Thomas. Respondent has failed to return Thomas' phone calls, and to this date, she has neither filed the adoption nor returned the retained funds to Thomas. At the hearing, Respondent testified that part of the $3,000.00 she retained was to be applied to an outstanding fee owed by Thom-

---

**10.** Count IV of the original complaint contained allegations by the Bar against Respondent on behalf of Hastings. However, the Bar has advised this Court it does not intend to offer evidence as to the allegations regarding Hastings and has requested dismissal of the allegations.

While the Bar may request a dismissal it does not possess the power to dismiss, in part, a complaint filed in this Court. See *State ex rel. Oklahoma Bar Association v. Bolusky,* 2001 OK 26, ¶ 16, 23 P.3d 268, 274–75. The original count IV as to Hastings is accordingly dismissed.

**1110**

as. The Trial Panel Report of the PRT reflects the restitution amount should be $1,500.00, rather than $3,000.00. Respondent's actions constitute violations of Rules 1.1, 1.3, 1.4 and 3.2, ORPC.

## COUNT VI

¶ 15 In Count VI, an alleged violation of Rule 5.2, RGDP, the Bar made two unsuccessful requests of Respondent to respond in writing to Thomas as to the circumstances in Count V. After speaking with Assistant General Counsel Nathan Lockhart, Respondent agreed to provide a response, indicating there was "nothing to the grievance". However, she failed to respond until the Bar served her with a subpoena *duces tecum,* and took her deposition approximately two months after the grievance was filed. Respondent's actions constitute violations of Rule 5.2, RGDP.

## STANDARD OF REVIEW

¶ 16 We review the evidence *de novo* to determine if the allegations of misconduct are established by clear and convincing evidence. *Bolusky,* supra. Respondent's depression has been diagnosed and is being treated with professional counseling and medication. We commend Respondent for understanding she needed help and obtaining this treatment. Although emotional or psychological disability may serve to reduce the actor's ethical culpability, it does not immunize one from imposition of discipline that is needed to protect the public. There must be a sufficient causal connection between the respondent's ethical lapses and the depression. See *State ex rel. Oklahoma Bar Association v. Schraeder,* 2002 OK 51, 51 P.3d 570 (causal connection was shown between ethical violations and condition of "occupational burnout"). Our responsibility in a bar disciplinary proceeding is not to punish but to inquire into the lawyer's continued fitness with a view toward safeguarding the interest of the public, the courts and the legal profession. *State ex rel. Okla. Bar Ass'n v. Adams,* 1995 OK 17, ¶ 4, 895 P.2d 701, 704.

¶ 17 Stipulations by the parties are considered in our review of the evidence, although our review includes an examination of the facts, stipulated or not. *Bolusky,* 2001 OK 26, ¶ 8, 23 P.3d at 273, n. 2, citing *State*

*ex rel. Oklahoma Bar Association v. Landman,* 1989 OK 162, 784 P.2d 1064. They serve as an evidentiary substitute, subject to approval of the Court. *Schraeder,* 2002 OK 51, ¶ 8, 51 P.3d at 574. Findings of fact and conclusions of law of the PRT are advisory, being neither binding nor persuasive. *Bolusky,* 2001 OK 26, ¶ 7, 23 P.3d at 272.

¶ 18 We have reviewed the evidence and find that the stipulations, findings of fact and conclusions of law are supported by the record. Additionally, we find that Respondent's depression was causally connected to her unethical conduct, beginning in most cases with neglect of a matter, which in turn led to more neglect. She stated, "[I] think what I did is I let my—I let my shame of the situation get in the way of my responsibility or my accountability. It was sort of like a circular thing." She acknowledged the negative impact of the depression on herself and everyone around her, although she was not cognizant of that at first. She stated she feels a great sense of shame, guilt and remorse in letting down her clients. She will continue her treatment, not because of the complaint filed in this case, but for herself. Respondent's psychologist also believes her condition will continue to improve, stating in a letter admitted as Respondent's Exhibit 1, "With Ms. Hummel now actively engaged in therapy, her prognosis is good. I have no doubt that she will return to her previous high level of functioning with minimal interference from depressive symptoms. She has (by interview with family and peers) been able to function at a superior level without interference from her mood disorder.... I professionally believe, without reservation, that Ms. Hummel will be able to return to the legal profession (without impairment) in full capacity if she so desires."

## DISCIPLINE

¶ 19 After reviewing the record, including the transcript and exhibits, the Stipulations, and the Trial Panel Report, we find that Respondent violated Rules 1.1, 1.2(a), 1.3, 1.4, 1.15(b), 3.2 and 8.4(c), ORPC, and Rule 5.2, RGDP.

¶ 20 This Court has imposed discipline on lawyers for neglecting their clients' matters, ranging from public censure to two years'

suspension. See *State ex rel. Oklahoma Bar Association v. Benefield,* 2002 OK 37, 51 P.3d 1198. In the present case, Respondent's neglect of her client's legal matters, pursuant to Rules 1.3 and 1.4, ORPC, was shown in Counts I through V of the Bar's Complaint.

¶ 21 This Court has held that appropriate punishment for the neglect of a client's case, without affirmative acts of misconduct, is public censure. See *State ex rel. Oklahoma Bar Association v. Brewer,* 1999 OK 101, 998 P.2d 605; *State ex rel. Oklahoma Bar Association v. Braswell,* 1983 OK 63, 663 P.2d 1228. However, when neglect is combined with the aggravating elements noted in *State ex rel. Oklahoma Bar Association v. Denney,* 1980 OK 143, 617 P.2d 1351 and *State ex rel. Oklahoma Bar Association v. Robertson,* 1980 OK 176, 620 P.2d 382, we have ordered suspension. See *Braswell,* 663 P.2d 1228, 1232, which distinguished *Denney* and *Robertson* and imposed discipline only for neglect:

> [T]his case lacks the aggravating elements found present in the others. There is here *no* evidence that Braswell ever misrepresented anything, that he failed to return the client's calls or that after the matter had been brought to his attention he neglected to check on its status. The record is devoid of any affirmative acts of misconduct. It reveals neither hesitancy to disclose the true facts to the client nor falsehood uttered in giving misleading or incorrect information about the status of the claim in the lawyer's charge. [Emphasis in original.]

¶ 22 In the present case, it is undisputed that Respondent failed to return her clients' calls. In Count I, the Jones grievance, she neglected to get a trial date set on the motion to modify custody. Instead, Respondent told Jones she was waiting for Jones' answers to interrogatories. She neglected to return her phone calls or to complete the work for which she was hired. In Count II, Allen waited for Respondent to send his file in a criminal matter for more than one year, after advancing $50.00 to Respondent for the costs of doing so. In Count III, Respondent failed to disclose the true facts to Gatz about the entry of orders for child support, visitation and attorney fees, even misrepresenting the fact that there had not been a trial in the

case. In Count IV, Respondent obtained an extension of the time to file an answer in Wells' divorce proceedings. When Wells could not reach Respondent by phone, she hired new counsel and attempted to obtain her file. After two certified letters from Wells requesting her file went unanswered, Wells' new counsel filed the answer and counter claim on the date they were due.

¶ 23 A recurrent theme among the grievances in this case is Respondent's failure to communicate with her clients to keep them informed of the status of their cases. Respondent's neglect also led to her clients' harm. Respondent entered into settlement agreements on behalf of Gatz in Count III for which she was not given authority. This violates Rule 1.2(a), ORPC. This led to the entry of judgment which was detrimental to Gatz because it increased her support obligations and restricted her visitation. Then, when asked about it, Respondent misrepresented the facts to her, violating Rule 8.4(c), ORPC. Moreover, Respondent failed to respond to a motion for attorney fees, which led to a default judgment against Gatz for more than $3,000.00, showing a lack of professional competence (Rule 1.1, ORPC) and diligence (Rule 1.3, ORPC).

¶ 24 Neglect also led to Respondent's violation of Rule 1.15(b), ORPC, in Count II, the Allen Grievance. After repeated requests for his file, Allen agreed to advance $50.00 to Respondent for her expenses in sending the file. Respondent agreed to return the excess money to Allen. Although the costs were only $6.60, and the remaining funds were kept in her trust account, Respondent has never returned the excess money.

¶ 25 Respondent also violated Rule 1.15(b) with regard to the Thomas grievance in Count V. She agreed to file an adoption proceeding and was paid, out of a child support award in Thomas's favor, the amount of $3,000.00. She never filed the adoption proceeding and has never returned the retainer. She claimed part of the retainer, approximately $1,500.00, was to be applied to previous attorney fees incurred by Thomas. Although Respondent never produced evidence to substantiate that claim, she testified that she had drafted and reviewed paperwork and had made telephone calls on Thomas' behalf. The Bar notes that Respondent was paid "at

least One Thousand, Five Hundred Dollars ($1,500.00)", which is in accord with the stipulation accepted by the PRT in its Trial Panel Report.

## IMPOSITION OF PUNISHMENT

¶ 26 While we find that a public censure would not be sufficient punishment for the degree of neglect found in this case, neither do we find that Respondent's conduct warrants a punishment of two years' suspension. See *Benefield,* supra. Additionally, we find no grounds to warrant disbarment, although suspension of two years and one day was ordered for multiple violations of Rules 1.1, 1.3, 1.4 and 3.2, ORPC, and Rule 5.2, RGDP in *State ex rel. Oklahoma Bar Association v. Minter,* 2001 OK 69, 37 P.3d 763. However, we found Minter lacked fitness to practice law and had repeatedly shown contempt for the Bar and the Court by his refusal to respond to disciplinary inquiries. In the instant case, however, there is evidence of Respondent's remorse and her wish to cooperate with the Bar, as well as to continue treating her depression condition. Moreover, her condition has been shown as a contributing factor to the neglect she showed in her clients' representation and in her reluctance to answer the Bar complaint. Therefore, we accept the PRT's recommendation that Respondent's license to practice law be suspended for one year. A one-year suspension was imposed in *State ex rel. Oklahoma Bar Association v. Rennie,* 1997 OK 108, 945 P.2d 494, despite the fact he filed a false response to the bar complaint, misrepresented facts to a client about summary judgment and told his client that opposing counsel had "bought off" the judge. He corrected the problems and made restitution. This Court gave great consideration to the fact that several members of the Judiciary and the local Bar testified on his behalf as to his character and honor, although recognizing the seriousness of his conduct. He also showed remorse and took action to ensure the same mistakes would not happen again. We think this is the correct approach to take in the instant case.

## ENHANCEMENT

¶ 27 Respondent was privately reprimanded by the PRC in two prior Bar matters. In OBAD # 964, she neglected to answer within twenty days after the service of a grievance from the Bar, violating Rule 5.2, RGDP. In OBAD # 1378, she was reprimanded for neglecting a client's case and for unprofessional conduct. It was stipulated that Respondent failed to respond to a motion for summary judgment resulting in a decision against her client and that she used loud and profane language in an argument with her client.

## MITIGATION

¶ 28 Respondent stated her depression affected her legal practice, but that she did not offer it as an excuse for neglecting her clients. Apparently, the neglect of one matter led to another, which had a circular effect. She testified she will continue to receive treatment in the form of therapy and medication for as long as it takes. She expressed remorse for her actions and for the difficulties her clients endured because of her conduct.

## CONCLUSION

¶ 29 Respondent's license to practice law is suspended for one year from the date this opinion becomes final. The Bar filed an application to assess the costs of this proceeding in the amount of $1,039.82 against Respondent. The application is granted, and Respondent is ordered to pay this amount within thirty days of the date this opinion becomes final. Respondent is also ordered to pay the $43.40 owed to Mr. Allen, and $1,500.00, representing the remainder of the $3,000.00 retainer, to Mrs. Thomas, in the same time period, if she has not already done so.

WATT, C.J., LAVENDER, BOUDREAU, WINCHESTER, EDMONDSON, JJ., concur.

OPALA, V.C.J., with whom HODGES and HARGRAVE, JJ., Join, Dissenting in Part:

I would hold today that upon passage of the declared suspension period respondent not become eligible for license reinstatement until, following a PRT-conducted inquiry, the tribunal should report (and recommend) that this court find her free of present impairments and once again fit to practice law.

KAUGER, J., dissents.

KAUGER, J., dissenting.

¶ 1 The complainant, Oklahoma Bar Association (Bar Association), charged the respondent with a series of counts of misconduct—the majority of which have a central theme of neglect and a failure to respond to inquiries both of clients and of the Bar Association in the disciplinary process. I agree that the respondent should be suspended from the practice of law. Nevertheless, because a careful review of the evidence reveals that the attorney's misconduct arose as a result of a severe depressive condition, I would treat the matter as a Rule 10 proceeding,[1] suspending the attorney from the practice of law until further order of the Court and imposing costs of the proceeding.[2] Therefore, I dissent.

¶ 2 NEGLECT BEING THE GRAVAMEN OF EACH OF THE FIVE DISCIPLINARY COUNTS COUPLED WITH EVIDENCE OF THE ATTORNEY'S INCAPACITY WARRANTS TREATMENT OF THE CAUSE AS A RULE 10 PROCEEDING, SUSPENSION UNTIL FURTHER ORDER OF THE COURT, AND THE IMPOSITION OF COSTS.

¶ 3 In disciplinary matters, this Court possesses exclusive original jurisdiction.[3] We are not bound by agreed findings, conclusions of law or recommendations for discipline.[4] Rather, the ultimate responsibility for imposition of professional discipline is ours alone. The Court's review is *de novo* in considering the record presented as well as the recommendations for discipline.[5] Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[6]

¶ 4 Although there is evidence of misrepresentation and the failure to timely return client funds, the gravamen of each of the five disciplinary counts involves the attorney's neglect and her failure to respond to clients' and to the Bar Association's inquiries. The Bar Association recognized at the hearing before the trial panel that the attorney's problems were linked to her bouts with depression.[7] The attorney testified that she had been suffering from depression in excess of ten years before the subject complaints were filed and that, because of her condition, she had begun to wind down her legal prac-

1. Rule 10.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A provides in pertinent part:
   "The term 'personally incapable of practicing law' shall include:
   (a) Suffering from mental or physical illness of such character as to render the person afflicted incapable of managing himself, his affairs or the affairs of others with the integrity and competence requisite for the proper practice of law;
   (b) Active misfeasance or repeated neglect of duty in respect to the affairs of a client, whether in matters pending before a tribunal or in other matters constituting the practice of law . . ."

2. Rule 10.11, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

3. Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Mayes*, 2003 OK 23, ¶ 17, 66 P.3d 398; *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, ¶ 1, 895 P.2d 707; *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 1989 OK 16, ¶ 5, 770 P.2d 892.

4. *State ex rel. Oklahoma Bar Ass'n v. Mayes*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Erickson*, 2001 OK 66, ¶ 14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel*, 2001 OK 42, ¶ 13, 25 P.3d 909.

5. *State ex rel. Oklahoma Bar Ass'n v. Israel*, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 14, 23 P.3d 268; *State ex rel. Oklahoma Bar Ass'n v. Dershem*, 2001 OK 7, ¶ 12, 21 P.3d 639.

6. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, ¶ 1, 937 P.2d 988; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 3, supra.

7. Transcript of proceedings, June 27, 2003, opening statement of counsel for the Bar Association providing in pertinent part at p. 8:
   "... Along the way, Cathy—I think I can say this with her permission—encountered some difficulties with depression and it cause, at least, in part—probably not wholly but, at least, in part, the problems that have us before you today...."

tice.[8] The attorney finally sought professional assistance in September of 2001, realizing that she was suffering from the most severe and lengthy episode of depression she had experienced.[9] Although the attorney did not impose her depression as a defense to the disciplinary action, she recognized that it had a major impact on her actions.[10] At times, the attorney was so overwhelmed that she felt as though it was impossible for her to act.[11] The licensed psychologist treating the attorney specifically felt that the attorney's handling of her practice and of her response to the Bar Association was directly related to a major depression-recurrent condition.[12]

¶ 5 In Rule 10 proceedings, the main objective is to minimize the potential risk to the public from a practitioner's incapacity. The focus is not exclusively on the past but rather on the attorney's present condition and its future consequences.[13] Subsections (a) and

8. Transcript of proceedings, June 27, 2003, attorney testifying in pertinent part at pp. 17–18: "... Q What led you, in September of 2001, to start winding down your practice? A I had—I think, over the years, actually, probably for a period of at least ten years had been experiencing bouts of what I now believe to have been clinical depression...."

9. It is worth noting that the grievances filed date between 2000 and 2002. Transcript of proceedings, June 27, 2003, attorney testifying in pertinent part: at pp. 18–19: "... I just—I couldn't decide at that time because I had been experiencing what was probably the most severe episode of depression that I'd had and the lengthiest. And at that time, I determined—I couldn't decide whether life was too short or life was too long to continue doing it. I didn't feel like that I could—that I could handle it. I wasn't handling it the way that I knew I could or should and so I just decided—at that point, I did ask a professional colleague for a referral to a therapist and then I began attending and I do still. I am still in therapy on a weekly basis...."; at pp. 37: "... It—it did have a great impact. The periods of time when I was not in a depressive episode, I did very well as a practitioner in terms of being successful with whether it was appellate work or litigation. But—and it—and it did negatively impact, but it's an explanation and that's all it is. And I have not sought treatment for it—I don't continue to seek treatment for it because of anything related to this complaint, these proceedings or anything of that nature. This is for me...."

10. Transcript of proceedings, June 27, 2003, attorney testifying in pertinent part at pp. 19–20: "... Q Can you see now, and where we are today, that your depression—what your depression had to do with the individual cases that we have before us? A Yes. I don't think that—not for a minute do I think—I don't think my depression, my illness is an excuse, is excusable. It is an explanation and it certainly—it heavily impacted, but I would never think to say that, in total, that it was all to blame. You know, I certainly have had, I think, complicity in it, even if it was a failure to seek treatment or a failure to know when to cut and run, you know, from a case. But yes, it impacted it...."

11. Transcript of proceedings, June 27, 2003, attorney testifying in pertinent part: at pp. 19–20: "... But yet, it just—it just became—now, it wasn't realistically impossible but it felt impossible to do one more thing, even something as simple as filing an answer in a counterclaim when you can't even find the other party ..."; at p. 40: "... And there's an art to knowing when to stay and when to go, and I overstayed, you know, my welcome. I should have—when I felt an inability to do the most minimal thing, I mean, I needed to back—I needed to back out at that time and I didn't...."

12. Respondent's exhibit 1 is a letter dated June 24, 2003, from Maribeth Spanier, Ph.D., directed to the Bar Association. It provides in pertinent part: "... Ms. Hummel initially sought treatment in August of 2001. She presented with a long history of Major Depression–Recurrent as evidenced by erratic sleep patterns, appetite disturbance, poor concentration and memory, volatile moods, apathy, amotivation, poor stress tolerance, hopelessness, and avoidance of stressful situation and people. By history, Ms. Hummel has experienced episodes of such depression for several years without treatment. Upon further evaluation, her report of her performance in her professional and personal life confirmed a recurrent pattern to her Depression. Ms. Hummel's Depression has significantly impaired her ability to respond to the Bar Association's complaints against her. Her response has been consistent with that of a person suffering Depression—overwhelmed, avoidant, and self-defeating. These are the same responses she had been demonstrating in her other professional and person endeavors...."

13. *State ex rel. Oklahoma Bar Ass'n v. Adams*, 1995 OK 17, ¶¶ 12–13, 895 P.2d 701; *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 15, 848 P.2d 543.

(b) of Rule 10.1, Rules Governing Disciplinary Proceedings,[14] define "personally incapable of practicing law" as including mental or physical illness, or a pattern of repeated neglect of legal matters. If an attorney is determined to be personally incapable of practicing law, the attorney shall be formally suspended from the practice of law until further order of the Court.[15]

¶ 6 It is undisputed by the majority, by the Bar Association, and by the trial panel that the attorney's performance was affected by her depressive condition.[16] If the facts here do not warrant the attorney's suspension on grounds that she is personally incapable of practicing law, then I cannot fathom a situation when a person should be suspended from the practice of law as mentally or physically incapable of its practice. Neglect being the gravamen of each of the five disciplinary counts coupled with evidence of the attorney's incapacity warrants treatment of the cause as a Rule 10 proceeding, suspension until further order of the Court[17] and the imposition of costs.[18]

## CONCLUSION

¶ 7 The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law is solely vested in this Court.[19] Every lawyer is presented as a person worthy of competence and honesty in the performance of professional activities. It is our difficult duty to withdraw the license to practice law if necessary to protect the interest of the public, the legal profession and this tribunal.[20] Any other approach would rightly confuse or equate a lawyer's state franchise with a license to cheat the public.[21]

¶ 8 I would convert this matter to a Rule 10 proceeding, suspend the attorney until she can demonstrate her ability to practice to the Court;[22] and impose costs.[23] The majority's failure to do so, in a situation where it recognizes that the facts warrant a finding of personal incapacity, raises the question of whether Rule 10 proceedings are ever appropriate or will be employed.

---

14. Rule 10.1, Rules Governing Disciplinary Proceedings, see note 1, supra.

15. *Id.*

16. See, opening statement of counsel for the Bar Association, note 6, supra. The majority opinion provides in pertinent part:

> in ¶ 18: "... We have reviewed the evidence and find that the stipulations, findings of fact and conclusions of law are supported by the record. Additionally, we find that Respondent's depression was causally connected to her unethical conduct, beginning in most cases with neglect of a matter, which in turn led to more neglect....";

> in ¶ 26: "... Moreover, her condition has been shown as a contributing factor to the neglect she showed in her clients' representation and in her reluctance to answer the Bar complaint...."

The trial panel report, filed on July 28, 2003, provides in pertinent part:

> at p. 7: "... Based on the testimony of the Respondent and Respondent's Exhibit No. 1 the Trial Panel finds that the Respondent has had a history of major depression which has impaired her ability to respond to the bar complaints against her. She has been in treatment with a clinical psychologist and continues treatment at this time...."

> at p. 4: "... The Respondent suffers from major depression-recurrent, a medical condition, and is taking steps to treat that condition...."

17. Rule 10.1, Rules Governing Disciplinary Proceedings, see note 1, supra.

18. Rule 10.11, Rules Governing Disciplinary Proceedings, see note 2, supra.

19. *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Farrant,* 1994 OK 13, ¶ 8, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n,* 1981 OK 12, ¶ 4, 624 P.2d 1049.

20. *State ex rel. Oklahoma Bar Ass'n v. Raskin,* 1982 OK 39, ¶ 22, 642 P.2d 262.

21. *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* 1992 OK 40, ¶ 15, 832 P.2d 814.

22. Rule 10.11, Rules Governing Disciplinary Proceedings, see note 2, supra.

23. *Id.*